McKEAGUE, Circuit Judge.
*488 According to Joann Matouk Romain's estate, two local police departments and many officers covered up Joann's murder. The alleged plot required duping other officers, the U.S. Coast Guard, and Canadian authorities. The motive? To help a friend who sold the officers alcohol at prices cheaper than Costco. What at first sounds fanciful is moored by some odd facts. For example, Joann's daughter swears that an unidentified officer questioned her about Joann before the police suspected Joann was missing. Another officer had Joann's spare key that allegedly went missing a month before her disappearance. That said, a reasonable jury could not return a verdict for the estate. As a result, we affirm the district court's decision to grant summary judgment to the defendants.
I.
In January 2010, police found Joann Matouk Romain's car alone in a church driveway. Two months later, a fisherman found her body in the Detroit River. This case is about the investigation of Joann's disappearance.
According to the police, the investigation started when an officer spotted Joann's car around 9 p.m. After running her license plate, the officer took no further action because the car was on private property. About an hour later, a different officer noticed the car. That officer was more concerned because the car was alone in the driveway, nobody was around, and it was a cold night. The officer approached the car and looked inside. Nobody was there.
People often park at the church, cross the street, and go down to Lake St. Clair. Suspecting that the car's driver may have done the same, the officer looked around. Nearby, he saw footprints in the snow heading towards an embankment. The officer followed the footprints. He then saw imprints suggesting that someone sat on a breakwall near the lake, pushed off to a second breakwall, and then sat on that second breakwall above the water. No footprints led back from the lake.
Based on those observations, the officer thought the person from the car might be in the water. He notified his supervisor, who then came to the scene. The supervisor agreed, so he activated the police department's dive team and contacted the U.S. Coast Guard. The search continued until the next afternoon. They did not find a body.
While some officers searched the water, others investigated the car. That investigation included sending an officer to Joann's house. There, the officer spoke with Joann's daughter. The daughter reported that Joann had attended an evening Mass and that she was not answering her phone. In the weeks that followed, police questioned people who knew Joann, who saw her at Mass, and who were near the lake the night she disappeared. Nothing concrete materialized.
Two months after the disappearance, a fisherman found a body on the Canadian side of the Detroit River. Canadian authorities responded and ultimately identified *489 Joann with help from their American counterparts. Before the Canadians released the body, a Canadian coroner performed an autopsy. He concluded that Joann drowned, but he could not determine the manner of death.
The body then went to a county medical examiner's office in Michigan. The county coroner performed another autopsy and drew the same conclusions. The coroner noted, however, that homicide was "less likely" than suicide because Joann had no significant injuries. He also opined that an accident seemed "quite unlikely" because Joann had no reason to be near the water.
Joann's daughter requested a third autopsy. Like the coroners, a doctor at the University of Michigan reported drowning as the cause of death with an undetermined manner of death.
Ultimately, the police could not find any answers. They have stopped actively investigating Joann's death, but the case is still open.
Joann's estate is unsatisfied with the investigation. It believes that an unknown person murdered Joann. Even worse, the estate claims that the police knew about the murder before it happened and botched the investigation to protect the killer. In support of that theory, the estate points to evidence it says shows that the police communicated with the killer and then improperly investigated the disappearance.
Starting with the communications with the killer, the estate says the evidence shows that the police knew about Joann's disappearance before finding her abandoned car. In support, the estate relies largely on an affidavit from Joann's daughter. The affidavit states that an unidentified officer arrived at Joann's house about thirty minutes before the police reported following the footprints to the water. That officer, the affidavit says, was not the officer that the police later claimed they sent. What is more, the officer asked about Joann. But Joann's car was registered in her daughters' names, so the officer should not have known that Joann was missing based only on a license plate check. The estate asserts that a jury could infer from those facts that the officer knew about Joann's disappearance before it happened. That would make sense, the estate says, only if the officer knew about the murder plot.
As further proof, the estate says the police had Joann's spare keys that went missing a month before her disappearance. An officer claims he picked up the keys from Joann's house the morning after she disappeared. The estate seems to insinuate that the officer is lying and that the police were in contact with the person who took the keys or that they took the keys themselves.
Turning to the investigation, the estate claims that the police concealed key evidence. The estate, for example, challenges the account that a single set of footprints led to the lake. In support, there are pictures showing many footprints by the water. The police explain that those prints are from the search party that was scrambling to find Joann. The family maintains, however, that the photos show either that there were more than one set of prints originally or that the police intentionally failed to preserve the original set of prints.
The estate also suggests that the police ignored a struggle. Joann's purse had a rip along the seam of a decorative flap. Her daughter says Joann carried her purse on her left shoulder, and that it was "in pristine condition" the day of her disappearance. And an autopsy report said that Joann had a contusion on her upper left arm. The estate says that these facts are *490 proof of a struggle that ended in murder. The police disagreed.
Finally, the estate criticizes the police's failure to investigate certain witness accounts. For example, a witness said she told the police that she saw an underdressed man wearing a scarf running near the water on the night Joann disappeared. Consistent with that observation, the police found a black scarf. But the witness's account is not in the police report, and the police disposed of the scarf after some time. A different witness says on the night Joann disappeared, he saw a motionless woman slumped over on the breakwall and two men standing nearby.[1] The police did not pursue that tip because they thought the witness was not credible.
Based on the alleged evidence of a cover up, the estate sued the two investigating police departments and many officers. Relevant to this appeal, the estate brought a Monell claim and a § 1983 claim alleging that there was a state-created danger because the officers made "it known to Killer John Doe that they would immediately cover up the murder and rule it a suicide." The district court granted summary judgment to the defendants. The estate now appeals that order.
II.
We review de novo a summary judgment ruling. Smith v. Perkins Bd. of Educ. , 708 F.3d 821, 825 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it would establish or refute an "essential element[ ] of a cause of action or defense asserted by the parties[.]" Kendall v. Hoover Co. , 751 F.2d 171, 174 (6th Cir. 1984) (quotation omitted). And a factual dispute is genuine if it is based on evidence that a reasonable jury could use to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reviewing the record, we view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Smith , 708 F.3d at 825.
III.
The estate makes grave factual allegations. But to prevail, it needs to turn those factual allegations into cognizable legal theories. The estate has struggled with that challenge. After failing below, the estate changed lawyers and legal theories. On appeal, it says that the police, as co-conspirators, are directly responsible for the murder because it occurred during a conspiracy.
A clever move, but not the one made below. There, the estate sought relief for a cover up-not a murder. Alleging a "state-created danger," the estate's complaint claimed that the defendants increased the risk of harm to Joann by telling the unknown killer that they would cover up the crime. And in its summary judgment briefing, the estate identified an "overall conspiracy to not investigate [Joann's] disappearance as a crime."
Putting those arguments aside, the premise of a state-created danger theory belies the estate's expanded appellate argument. If the estate intended to hold the defendants liable for murder, then the police did not create the danger-they were *491 the danger. See Jones v. Reynolds , 438 F.3d 685, 695 (6th Cir. 2006) ("Had the officers organized or participated in [the crime], the issue would cease to turn on whether they were responsible for harm caused by a private actor and would turn instead on whether they had caused the harm themselves.").
As the district court explained, a state-created danger theory provides a narrow path for recovery. Now that the case is on appeal, the estate cannot seek a more forgiving path. Bowles v. Marx Hide & Tallow Co. , 153 F.2d 146, 149 (6th Cir. 1946) ("Appellant, on appeal, cannot change the theory of his case made by his pleadings and his conduct of the case.") We therefore consider the claim as the estate presented it below.
The estate cannot recover under a state-created danger theory. The state-created danger doctrine allows plaintiffs to bring due process claims under § 1983 for harms caused by private actors-an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors. Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ. , 542 F.3d 529, 534 (6th Cir. 2008) ; Barber v. Overton , 496 F.3d 449, 458 (6th Cir. 2007). Although the doctrine stems from a Supreme Court case, it does not have a strong foundation. See Hunt , 542 F.3d at 534. In DeShaney v. Winnebago County Department of Social Services , county authorities returned a child to his abusive father who then beat the child again. 489 U.S. 189, 192-93, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The child and his mother sued the county and its employees, alleging a violation of the child's substantive due process rights. Id. at 193-95, 109 S.Ct. 998. The Supreme Court rejected the claim because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195, 109 S.Ct. 998.
The Court also addressed an argument that a state may have a duty, arising out of "special relationships," to protect certain individuals. Id. at 197, 109 S.Ct. 998. When addressing that argument, the Court acknowledged precedent requiring states to protect inmates, to provide medical care to inmates, and to ensure the reasonable safety of involuntarily committed mental patients. Id. at 198-99, 109 S.Ct. 998. But the Court held that the precedent was limited to situations where a state holds a citizen against his will because then the state has affirmatively restrained the citizen's ability to care for himself. Id. at 199-200, 109 S.Ct. 998. That logic did not apply in DeShaney , Chief Justice Rehnquist wrote, because "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201, 109 S.Ct. 998.
That passage could be read as simply explaining that the county in DeShaney had not restrained the child's ability to protect himself and thus the cited precedent did not apply. But our circuit and others have read it more broadly to imply a new theory of constitutional liability-the state-created danger doctrine. McQueen v. Beecher Cmty. Sch. , 433 F.3d 460, 464 (6th Cir. 2006) ; Erwin Chemerinsky, The State-Created Danger Doctrine , 23 Touro L. Rev. 1 (2007). Under that doctrine, plaintiffs can recover for private harms if they show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public *492 at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." Cartwright v. City of Marine City , 336 F.3d 487, 493 (6th Cir. 2003) (citation omitted).
That is a "demanding standard." Jones , 438 F.3d at 691 (quoting Sargi v. Kent City Bd. of Educ. , 70 F.3d 907, 913 (6th Cir. 1995) ). Indeed, some of our cases have recognized an "additional element"-that the government's conduct shocks the conscience-to ensure "that the standards for proving a state-created-danger violation based on governmental inaction correspond to the standards necessary for proving a substantive due process violation based on governmental action." Schroder v. City of Fort Thomas , 412 F.3d 724, 730 (6th Cir. 2005). We therefore often reject allegations of a state-created danger. McQueen , 433 F.3d at 465 (collecting cases). This case is no different.
The estate cannot make the first showing, that the defendants' affirmative actions increased the risk of harm to Joann. When looking for an increased risk, we focus on "whether [the victim] was safer before the state action than he was after it." Koulta v. Merciez , 477 F.3d 442, 445-46 (6th Cir. 2007) (quoting Cartwright , 336 F.3d at 493 ) (brackets in original). At first blush, the estate seems to satisfy that requirement. If the alleged murderer knew that the police would cover up the crime, the reduced risk of penalty may have encouraged the murderer to proceed with his plot.[2] Other circuits have accepted similar theories. See Dwares v. City of New York , 985 F.2d 94, 99 (2d Cir. 1993) recognized as overruled on other grounds by Montero v. City of Yonkers , 890 F.3d 386, 403 (2d Cir. 2018) ; Freeman v. Ferguson , 911 F.2d 52, 54-55 (8th Cir. 1990).
But even if we accepted that theory, the estate has failed to establish a genuine issue regarding the officers' alleged assurance that they would conceal the murder. The estate cites limited circumstantial evidence and asks this court to infer not only that the police knew beforehand of the plan to murder Romain, but also that the police told the killer that they would conceal the murder. No direct evidence supports this conclusion; and no reasonable jury could make the speculative inferences required to reach it.
Two final points. First, the estate asks us to revive its Monell claim. Because the estate's theories against the individual officers fail, we decline that request. See Fox v. DeSoto , 489 F.3d 227, 238 (6th Cir. 2007) (recognizing that there can be no municipal liability if the municipality's agent or employee did not violate the Constitution). Second, the estate argues that the alleged botched investigation denied it access to the courts. The estate did not include that claim in its operative complaint, and the district court denied the estate's request to add it later. Rather than challenging the denial of leave to amend, the estate acts as if its request for leave is enough for us to consider the claim's merits on appeal. We decline the invitation.
IV.
In sum, no reasonable jury could return a verdict for the estate. We thus affirm the district court's decision to grant summary judgment to the defendants.

The witness claimed that, after seeing a picture, he could identify one of the men. The district court excluded that evidence from the record as a sanction for spoliation, and we do not consider it here.

To be clear, it is uncertain that anybody killed Joann. Three doctors performed autopsies. None listed murder as the manner of death.