RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARK M. MESSING,

  *Plaintiff-Appellant/Cross-Appellee*,

 *v.*

PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY,

  *Defendant-Appellee/Cross-Appellant*.

⎤
⎥
⎥
⎥  Nos. 21-2780/2790
⎥
⎥
⎦

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-00351—Hala Y. Jarbou, District Judge.

Argued: June 9, 2022

Decided and Filed: September 9, 2022

Before: CLAY, ROGERS, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Gerald B. Zelenock, Jr., JAY ZELENOCK LAW FIRM PLC, Traverse City, Michigan, for Appellant/Cross-Appellee. D. Andrew Portinga, MILLER JOHNSON, Grand Rapids, Michigan, for Appellee/Cross-Appellant. **ON BRIEF:** Gerald B. Zelenock, Jr., JAY ZELENOCK LAW FIRM PLC, Traverse City, Michigan, George R. Thompson, THOMPSON O'NEIL PC, Traverse City, Michigan, for Appellant/Cross-Appellee. D. Andrew Portinga, Jacob Carlton, MILLER JOHNSON, Grand Rapids, Michigan, for Appellee/Cross-Appellant.

───────────────

## OPINION

───────────────

CLAY, Circuit Judge. Plaintiff Mark Messing received long-term disability benefits from Defendant Provident Life & Accident Insurance Company ("Provident") from 2000 until

2018, at which time, Provident terminated Messing's benefits.  Messing commenced this action seeking the reinstatement of his benefits.  Provident counterclaimed that it was entitled to reimbursement for the benefits it had paid Messing over those eighteen years.  The district court denied Messing's motion for judgment on the administrative record, which sought to reinstate his benefits, finding that Messing had failed to show by a preponderance of the evidence that he remained unable to work; but the court granted Messing's motion for summary judgment on Provident's counterclaim.  For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part.

## I. BACKGROUND

### A. Factual Background

Mark Messing was an attorney in Traverse City, Michigan.  In 1985, he applied for a long-term disability ("LTD") insurance policy (the "Plan") through Provident.  During the application process, Messing indicated that his occupation was "attorney" and that the "exact duties" of his occupation were simply to "practice law."  (LTD Policy Application, R. 1-1, PageID #28.)  Provident approved Messing's application, and the Plan went into effect on August 1, 1985.

The Plan provided that if Messing suffers a "Total Disability due to . . . Sickness" after 1988 but before he reached the age of 65, he would receive monthly payments of $3,080 "for life."  (*Id.*, PageID ##15, 17, 34.)  According to the Plan's definitions, "Total Disability" meant that the insured is "not able to perform the substantial and material duties of . . . the occupation (or occupations, if more than one) in which [he is] regularly engaged at the time [he] become[s] disabled."  (*Id.*, PageID #16.)  Additionally, the Plan defined "Sickness" to include a "sickness or disease which is first manifested while [the] policy is in force."  (*Id.*)  The Plan also provided that "Benefits are payable while a period of Total Disability continues," and that the beneficiary "must present satisfactory proof of [his] loss."  (*Id.*, PageID #17.)  Messing consistently paid the Plan premiums.

Beginning in 1994, Messing began struggling with depression.  At first, the depression was mild, and his doctor prescribed him anti-depressants.  But by 1997, his condition

deteriorated.  Messing was admitted to the hospital for his depression on January 2, 1997, and not released from an outpatient treatment center until January 27, 1997.  He returned to work on January 31, but never in a full-time capacity.

In March 1998, Messing filed a claim with Provident claiming he was totally incapable of working as an attorney.  On his claim form, he indicated his job title as "attorney admitted to Michigan and federal bar, personal injury litigation."  (Occupational Information, R. 38-9, PageID #1691.)  He attached to his application an "Attorney Questionnaire."  In the questionnaire, Messing indicated that at the time of submitting his claim, his job duties included: (1) traveling by car and air; (2) preparing for and appearing in court; (3) filing documents with a court or agency; (4) taking depositions; (5) interviewing clients in person; (6) legal research; (7) writing briefs; (8) completing and answering discovery requests; (9) writing letters or memos; (10) using the telephone; (11) investigating cases outside of my office; (12) closing files; (13) hiring secretarial help; (14) managing secretarial help; (15) reading advance sheets, professional journals, and articles; (16) discussing cases with other lawyers; and (17) attending professional continuing education programs or seminars.

Provident initially approved his claim; but after a few months of payouts, it changed course and initiated a dispute.  Messing commenced a lawsuit in 1999, which was settled in 2000 with Provident agreeing to resume payments.

Every year Messing was asked in some form what duties of his former job he was able to perform.  Every year he indicated in varying terminology that he was unable to perform substantially all of the duties he performed as a personal injury trial attorney and that he had no intention of ever returning to practice.  In 2010, Provident began using an "Individual Disability Status Update" form.  (*See*, *e.g.*, R. 38-2, PageID ##675–77.)  The Individual Disability Status Updates continued to ask what duties of lawyering Messing was unable to perform, to which Messing continued to indicate "substantially all."  (*See, e.g., id.*)  Notably, the Individual Disability Status Updates contained a "Fraud Warning," which cautioned Messing against submitting "false, incomplete, or misleading information" regarding his claim.  (*See, e.g., id.*, PageID #677.)  After the fraud warning, Messing signed a notice stating, "I also acknowledge that should my claim be overpaid for any reason it [is] my obligation to repay any such

overpayment." (*Id.*) Messing signed identical acknowledgments from 2010 through 2017. (R. 38-2, PageID ##677, 758, 774, 794, 815, 835, 851, 874.)

In 2018, Provident transferred Messing's claim to Jennifer Crowley, a Senior Disability Specialist, for review. During her review, Crowley contacted Messing. She specifically asked him whether he had represented any individuals, and Messing stated he had not.

Crowley sought further proof, beyond Messing's own certifications, that he was actually unable to work as an attorney. Provident requested updated records from Messing's treating psychiatrist, Dr. Laura Franseen. Dr. Franseen submitted a report in July 2018 diagnosing Messing with "Major Depressive Disorder, recurrent, minimal to mild." (Franseen Report, R. 38-4, PageID #1177.) She noted that Messing had stopped using medications to treat his depression in 2012 "and ha[d] been stable for the most part since then." (*Id.*) She concluded her report noting that although Messing "must avoid highly stressful situations as best he can, . . . [h]e is better able to tolerate 'normal stress' nowadays." (*Id.*, PageID #1178.) Dr. Franseen's report did not render an opinion as to whether Messing could return to work.

Provident had Dr. Alex Ursprung review Dr. Franseen's report. Dr. Ursprung believed based on Messing's medical record that Messing could return to work. He sent a follow-up letter to Dr. Franseen asking "[d]o you agree with my opinion that Mr. Messing is not psychiatrically precluded from returning to work?" (R. 38-11, PageID #2022.) When Dr. Franseen did not reply to the letter, Dr. Ursprung called. As in her report, she expressly refused to give her opinion as to whether Messing could return to work as an attorney.

To get an answer to this question, Provident then hired Dr. Craig Lemmen for the specific purpose of evaluating whether Messing could work. Dr. Lemmen conducted an interview with Messing for over two hours. After their meeting, Dr. Lemmen prepared a lengthy report. He noted that Messing "indicated that he was not depressed at this point in time and that he is trying not to have any anxiety." (Lemmen Report, R. 38-15, PageID #2492.) When Dr. Lemmen asked Messing how he was impaired at that time, Messing replied, "I'm not." (*Id.*) Dr. Lemmen agreed with Dr. Franseen's diagnosis of Major Depressive Disorder, but found that Messing "is not experiencing significant symptoms." (*Id.*, PageID #2493.) Therefore, in Dr. Lemmen's

professional opinion, Messing's condition was "in remission." (*Id.*) At bottom, Dr. Lemmen concluded "[t]here is no objective evidence that [Messing] would not be able to practice as an attorney, should he desire to do so." (*Id.*, PageID #2494.)

Provident reviewed Dr. Franseen's report and Dr. Lemmen's report and determined that Messing was no longer unable to work as a personal injury trial attorney. Messing appealed the termination of his benefits to Provident's appeals division. In support of his appeal, Messing attached three affidavits from attorneys who all stated that, in their opinions, Messing was unable to return to work as an attorney. Messing also attached a report from a third psychiatrist, Dr. Paul Callaghan. Dr. Callaghan agreed with Dr. Franseen and Dr. Lemmen that Messing suffered from "Major Depression, recurrent." (Callaghan Report, R. 38-17, PageID #2852.) He noted that Messing's diagnosis was "in remission" because of his "diligence and mindfulness to avoid significant stressors." (*Id.*) However, Dr. Callaghan disagreed with Dr. Lemmen's findings "that there is 'no objective evidence' that Mr. Messing would not be able to return to practice as an attorney, as Mr. Messing has a clear history of exacerbation of major depression when exposed to stressors, particularly work stressors." (*Id.*) Finally, Messing attached to his appeal a vocational rehabilitation evaluation.[1]

Provident reviewed the evidence presented on appeal. It found Dr. Lemmen's ten-page report "thoughtful, comprehensive and consistent with accepted professional standards," and Dr. Callaghan's one-and-a-half-page report "quite terse." (R. 38-17, PageID ##2879–80.) Ultimately, Provident's appeals division affirmed the termination of Messing's benefits.

**B. Procedural Background**

In April 2020, Messing commenced this action. He alleged that by ceasing his benefits payments, Provident breached the Plan in violation of Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* While litigating Messing's claim, Provident found evidence that Messing had occasionally been working as an attorney while collecting his

---

[1]The vocational rehabilitation evaluation suggested that Messing was unable to return to work as a personal injury trial attorney. However, "[v]ocational expert testimony . . . has no relevance to long-term disability claims like the one here where the question is whether [Messing] is able to return to his former position based on the medical evidence." *Gilewski v. Provident Life & Accident Ins. Co.*, 683 F. App'x 399, 408 (6th Cir. 2017).

disability payments. Between 1999 and 2013, Provident identified thirteen instances of Messing performing legal services for others, and evidence that he represented himself in divorce proceedings in 2001. In these representations, Messing performed a broad array of legal services including, but not limited to: (1) filing briefs, (2) interviewing clients, (3) negotiating settlements, (4) appearing for a bench trial, (5) negotiating plea agreements, (6) examining witnesses, and (7) performing legal research. Messing never disclosed any of this work to Provident. Although Messing's work spanned over a decade, there is no indication he ever resumed working as an attorney in a full-time capacity. Upon learning this information, Provident filed a counterclaim seeking to recover overpaid benefits pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

Messing moved for judgment on the administrative record, and for summary judgment on Provident's counterclaim. The district court affirmed the termination of Messing's benefits and granted the motion for summary judgment. After thoroughly considering the administrative record, the court found Dr. Franseen's report, Dr. Lemmen's report, and Dr. Callaghan's report to be the most pertinent evidence. It held that "Dr. Callaghan's perfunctory report does not outweigh Dr. Lemmen's findings;" and therefore, "Messing ha[d] failed to show by a preponderance of the evidence that he [was] disabled within the meaning of the policy at issue." (Op., R. 56, PageID #3395–96.) Regarding the motion for summary judgment, the court held Provident had failed to proffer evidence that Messing's fraudulent statements that he was totally unable to work induced it into continuing payments. Although Provident had introduced evidence that it would have reviewed Messing's claim if it had known he were performing the duties of an attorney, the district court held "reviewing Messing's file is not the same as terminating benefits." (*Id.*, PageID #3398.) Therefore, Provident had not proven it was induced into making payments it otherwise would not have made. Further, the district court held Messing's attestations that he would repay any overpayments could not support a claim under ERISA because they were promises made separate and apart from the Plan.

Messing appealed the termination of his benefits and Provident cross-appealed the grant of summary judgment on its counterclaims.

## II. ANALYSIS

### A. Termination of Messing's Benefits

#### i. Standard of Review

"Courts review a plan administrator's termination of benefits de novo unless the plan grants the administrator 'discretionary authority to determine eligibility for benefits or construe the terms of the plan.'" *Davis v. Hartford Life & Accident Ins. Co*., 980 F.3d 541, 545 (6th Cir. 2020) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  A plan grants "discretionary authority" when the "plan expressly grants to the administrator such discretion, and there is no evidence of a conflict of interest." *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 365 (6th Cir. 2009).  The Plan at issue in this appeal does not expressly grant Provident discretionary authority to determine Messing's eligibility for benefits; and therefore, the parties properly agree that de novo review is appropriate.  De novo review applies to both the district court's and administrator's decisions. *Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609, 613 (6th Cir. 1998).  Importantly, our review of Provident's decision to terminate Messing's benefits is limited to "only the evidence available to the administrator at the time the final decision was made." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014).

#### ii. Application

"To succeed in his claim for disability benefits under ERISA, [Messing] must prove by a preponderance of the evidence" that he remains disabled according to the Plan's terms. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700 (6th Cir. 2014).  The Plan provides that "Benefits are payable for Total Disability due to Injuries or Sickness." (LTD Policy, R. 1-1, PageID #17.)  The Plan continues that "Total Disability" occurs when the participant "[is] not able to perform the substantial and material duties of [his] occupation; and [he is] under the care and attendance of a Physician."[2]  (*Id*., PageID #16.)  The Plan further states that "occupation" means "the occupation . . . in which you are regularly

---

[2]Provident later dropped the requirement that covered individuals be under the care of a physician to receive total disability benefits.

engaged at the time you became disabled." (*Id*.) Thus all together, Messing must prove by a preponderance of the evidence that he remains unable to perform the substantial and material duties that he previously performed as an attorney in 1998.

Fortunately, we need not speculate as to the duties Messing previously performed. When Messing first filed his claim for benefits in 1998, he specifically identified his duties at that time. He indicated that his duties included: (1) "telephone contact with clients, opposing attorneys, courts and witnesses"; (2) "travel"; (3) "writing memos, correspondence"; (4) "Research—legal and factual"; (5) "Court Appearances and preparation"; (6) "interviewing clients"; (7) "depositions"; and (8) "writing briefs."[3]  (Occupational Info. Form, R. 38-14, PageID #2386.) With these duties in mind, we consider whether Messing has shown by a preponderance of the evidence that he remains unable to work.

To make his case, Messing predominantly relies on two categories of evidence: expert reports and attorney affidavits. Turning first to the three psychiatrists' reports, Messing finds some help. Dr. Franseen's report, which was prepared first, is neutral. She diagnosed Messing as suffering from "Major Depressive Disorder, recurrent, minimal to mild," which "[i]nfrequently to occasionally [manifests] with symptoms of sadness, and/or anxiety, feeling unmotivated, and/or lacking in energy." (Franseen Report, R. 38-17, PageID #2849.) She noted that Messing had "discontinued his psychotropic medications in early 2012 and ha[d] been stable for the most part since then, because of his diligent psychotherapeutic work." (*Id*.) Dr. Franseen assigned Messing a Global Assessment of Functioning[4] ("GAF") score between a 60 and 65. She finished her report noting that although Messing "must avoid highly stressful situations as

---

[3]On a different form accompanying his application, Messing indicated his duties were (1) traveling by car and air; (2) preparing for and appearing in court; (3) filing documents with a court or agency; (4) taking depositions; (5) interviewing clients in person; (6) legal research; (7) writing briefs; (8) completing and answering discovery requests; (9) writing letters or memos; (10) using the telephone; (11) investigating cases outside of my office; (12) closing files; (13) hiring secretarial help; (14) managing secretarial help; (15) reading advance sheets, professional journals, and articles; (16) discussing cases with other lawyers; and (17) attending professional continuing education programs or seminars.

[4]A GAF score measures how well an individual is functioning in his daily life. Scores range from 0 to 100. *See Gilewski v. Provident Life & Accident Ins. Co.*, 683 F. App'x 399, 402 n.1 (6th Cir. 2017). A score of 61–70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well." *See* https://www.albany.edu/counseling_center/docs/GAF.pdf

best he can, . . . [h]e is better able to tolerate 'normal stress' nowadays." (*Id*., PageID #2850.) Most importantly, Dr. Franseen expressly refused to opine on whether Messing could perform his former duties. Her explicit refusal to render an opinion on Messing's ability to work came shortly after her 2017 assessment that concluded that Messing should do his best "to avoid high stress situations *and occupations*." (2017 Franseen Report, R. 38-2, PageID #630 (emphasis added).) Overall, Dr. Franseen's report cuts both ways; neither Messing nor Provident can find much help.

Next, Dr. Lemmen's report clearly weighs against Messing. Dr. Lemmen conducted an interview with Messing for over two hours. After their meeting, Dr. Lemmen prepared a ten-page report. He noted that Messing "indicated that he was not depressed at this point in time and that he is trying not to have any anxiety." (Lemmen Report, R. 38-15, PageID #2492.) And when Dr. Lemmen asked Messing how he was impaired at the time, Messing replied "I'm not." (*Id*.) Dr. Lemmen agreed with Dr. Franseen's diagnosis of Major Depressive Disorder, but found Messing "is not experiencing significant symptoms," which suggested Messing's depression was "in remission." (*Id*., PageID #2493.) Critically, Dr. Lemmen concluded "[t]here is no objective evidence that [Messing] would not be able to practice as an attorney, should he desire to do so." (*Id*., PageID #2494.)

Messing tries to discredit Dr. Lemmen and his report in two ways. First, Messing argues Dr. Lemmen is biased and describes Dr. Lemmen's report as "an exercise in unfounded, unqualified, question-begging." (First Br. 35–36.) Courts are sometimes skeptical when an insurance company repeatedly calls an expert who consistently draws conclusions in favor of the company. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[P]hysicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements."). However, Messing provides absolutely no evidence to suggest that Dr. Lemmen is biased against his claim besides the bare allegation that Provident hired Dr. Lemmen to provide a second opinion. Additionally, Messing takes issue with the fact that Dr. Lemmen concluded there was no evidence that Messing could not return to work as an "attorney." (Lemmen Report, R. 38-15, PageID #2494.) Messing counters that at the time he first claimed to be disabled his occupation

was "full-time personal injury trial attorney," not simply an "attorney."  (First Br. 24–33.)  We need not fret over the differences between the meaning of "personal injury trial attorney" and "attorney" because the Plan requires that we focus our analysis on what *duties* Messing performed, not what title he held.  Messing has not identified any duties that are required of an "attorney" that are not required of a "personal injury trial attorney," or vice versa.  And conveniently, Messing takes issue only with Dr. Lemmen's use of the word "attorney," even though Dr. Callaghan concluded "[Messing] clearly remains disabled to tolerate the stresses associated with work as an attorney."  (Callaghan Report, R. 38-17, PageID #2852.)

Finally, there is Dr. Callaghan's report.  His report agreed with Dr. Franseen and Dr. Lemmen that Messing suffered from Major Depression, recurrent.  Dr. Callaghan noted that Messing's diagnosis was "in remission" because of his "diligence and mindfulness to avoid significant stressors."  (Callaghan Report, R. 38-17, PageID #2852.)  However, Dr. Callaghan disagreed with Dr. Lemmen's finding "that there is 'no objective evidence' that Mr. Messing would not be able to return to practice as an attorney, as Mr. Messing has a clear history of exacerbation of major depression when exposed to stressors, particularly work stressors."  (*Id.*)  In short, Dr. Callaghan concluded that Messing "clearly remains disabled to tolerate the stresses associated with work as an attorney."  (*Id.*)

The district court found Dr. Callaghan's report "unconvincing," (Op., R. 56, PageID #3393), and Provident described it as "quite terse," (R. 38-17, PageID #2879.)  However, both the district court and Provident rely on Dr. Franseen's report, which is approximately the same length.  Thus, the length of Dr. Callaghan's report provides no basis under these facts to find it less credible than Dr. Franseen's report.

All doctors acknowledged the fragile state of Messing's mental health and that he should be mindful to avoid stressful environments to prevent a relapse into a worse state of depression.  Dr. Franseen refused to render an opinion on Messing's ability to return to work and Dr. Lemmen couched his conclusion in a double negative—that there was no evidence that Messing could not return to work.  Only Dr. Callaghan directly addressed the question at issue: whether Messing could return to work.  He squarely stated Messing could not.

To supplement his reliance on the experts' reports, Messing also introduced affidavits from three attorneys. To varying degrees, these affidavits state that lawyering is a stressful occupation, that Messing lacks the ability to deal with stress, and that Messing has lost the skills to return to the practice of law after a 20-year hiatus.

To the extent that the affidavits suggest lawyering is a stressful occupation, this Court has already acknowledged as much. *See, e.g.*, *Heffernan v. UNUM Life Ins. Co. of Am.*, 101 F. App'x 99, 106 (6th Cir. 2004) ("[T]here is no evidence that litigation can ever be conducted in a low-stress environment."). Provident does not dispute this fact. Additionally, to the extent the affidavits suggest Messing no longer possesses the skills to return to the practice of law, they are irrelevant. The question at issue is whether Messing suffers *from a disability* that prevents him from working as a lawyer. The loss of skills necessary to work as a lawyer is a separate problem that goes to his employability as a lawyer, not Messing's disability. Finally, insofar as the affidavits suggest Messing still suffers from depression, which prevents his ability to work as a personal injury trial attorney, the affidavits are relevant. Accordingly, the attorneys' affidavits provide some support for Messing's argument that he continues to suffer from a disability preventing him from practicing as a trial attorney.

As mentioned above, to succeed on his motion on the administrative record, Messing must show by a preponderance of the evidence that he remains unable to return to work as a personal injury trial attorney. *Javery*, 741 F.3d at 700. Considering the doctors' reports and the affidavits together, Messing has met this burden. True, the reports and affidavits repeatedly suggest that Messing's mental health has been improving since he stopped working as a personal injury trial attorney. But improvements in Messing's health do not necessarily mean he can return to working as a full-time personal injury attorney. In fact, as Dr. Callaghan noted, Messing's progress is likely attributable to his nearly two-decade abstention from practicing law. Moreover, Dr. Lemmen's report does not address or opine on whether Messing's improvement is directly tied to his practicing as an attorney.

While the reports and affidavits support Messing's claim, we note that the administrative record also contains some evidence of Messing performing legal services.[5] In 2004, a protest gathered at a presidential campaign rally in Traverse City, Michigan. A local newspaper reported on the protests, writing:

> [Two individuals were] arrested and charged with disorderly conduct for breaching the "sterile zone" set up by the Secret Service along the motorcade route. And when their attorney, Mark Messing, attempted to speak with them, he too was arrested. . . . Messing is outraged that [the individuals] were detained in this manner, questioned without an attorney present, and that he was arrested for identifying himself to police and attempting to represent his clients.
>
> "Clearly no one is paying attention to the Bill of Rights here," said Messing of the arrest scenario, ". . . By arresting me they've compromised my clients' abilities to have their attorney of choice.["]

(Newspaper Art., R. 38-3, PageID ##1018–19.) Notably, this representation occurred in 2004; the same time Messing was telling Provident his depression prevented him from performing substantially all the duties of being a trial attorney.

Undeniably, this article undercuts Messing's argument that he cannot return to work. But its probative value is minimal. The record does not explain the scope of Messing's work for those two individuals or whether he ever actually provided legal services, other than attempting to speak to law enforcement officers on their behalf at a public protest. At best, the article indicates that Messing "attempted" to perform some of his previous lawyering duties. And in any event, we cannot say that one fourteen-year-old instance of attempting to represent two individuals outweighs the contemporary evidence in Messing's favor.

Considering the foregoing evidence, Messing has proven by a preponderance of the evidence that he remains unable to return to work as an attorney. Because the district court has held otherwise, we reverse.

---

[5]We are mindful to address only the 2004 protest incident as that is the only instance of Messing's lawyering conduct contained in the administrative record. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) ("When reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made."). While Provident alleges that Messing performed legal services on other occasions, none of those instances appears to be in the administrative record.

**B. Provident's Counterclaim for Equitable Lien**

### i. Standard of Review

We review summary judgment rulings *de novo*. *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 490 (6th Cir. 2019). Summary judgment is only appropriate where the movant has shown "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A "factual dispute is genuine if it is based on evidence that a reasonable jury could use to return a verdict for the nonmoving party." *Est. of Romain*, 935 F.3d at 490 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a summary judgment motion, the court is not "to weigh the evidence and determine the truth of the matter" but rather must "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. The court must construe the evidence in the record and all inferences to be drawn from it in the light most favorable to the non-movant. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).

### ii. Application

Section 502(a)(3) of ERISA authorizes fiduciaries to bring civil suits "to obtain other appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3). The "equitable relief" available under "§ 502(a)(3) is limited to those categories of relief that were typically available in equity during the days of the divided bench." *Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (citation omitted) (emphasis omitted). To recover in equity, insurers were historically required to "identify a particular fund, distinct from an insured's general assets, and the portion of that fund to which the plan is entitled." *Hall v. Liberty Life Assur. Co. Of Bos.*, 595 F.3d 270, 275 (6th Cir. 2010). Typically, equitable liens also require that the property to which the plaintiff seeks to attach a lien "could clearly be traced to particular funds or property in the defendant's possession." *Montanile*, 577 U.S. at 143. Thus, if funds were used to purchase a home or vehicle, a lien would automatically attach; but if the funds were used to purchase consumables, such as food, no lien could attach. *Zirbel v. Ford Motor Co.*, 980 F.3d 520, 524 (6th Cir. 2020).

Provident asked the district court to impose either an equitable lien for restitution or an equitable lien by agreement on the allegedly overpaid funds. The district court held Provident was not entitled to either lien. We agree.

## C. Equitable Lien for Restitution

Equitable relief available under ERISA "includes restitution of ill-gotten plan assets or profits[.]" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993). Equitable restitution focuses on depriving the beneficiary of ill-gotten gains, as opposed to compensating a fiduciary for its loss. *Helfrich v. PNC Bank, Ky.*, 267 F.3d 477, 482 (6th Cir. 2001). In other words, equitable restitution "seeks to punish the wrongdoer." *Id*. at 481.

The district court held that to obtain an equitable lien for restitution, Provident needed to prove that Messing's statements "induced" it into making payments it otherwise would not have made. (Op., R. 56, PageID ##3397–98.) According to the district court, because Provident had failed to proffer any evidence that it would have terminated Messing's benefits earlier, it failed to prove his allegedly fraudulent statements induced the payments. Provident disagrees with the district court's holding, arguing that the remedy of restitution simply exists to "restor[e] the status quo," regardless of whether the damaged party was induced.[6] *Helfrich*, 267 F.3d at 482.

We agree with the district court. Whether a party must prove inducement when seeking recovery for overpayment of benefits in an ERISA action seems to be an unanswered question in the Sixth Circuit. "To determine . . . the nature of the remed[y] sought, we turn to standard treatises on equity, which establish the 'basic contours' of what equitable relief was typically available . . ." *Montanile*, 577 U.S. at 142. According to the Restatement of Restitution, "[a] transfer *induced* by fraud or material misrepresentation is subject to rescission and restitution. The transferee is liable in restitution as necessary to avoid unjust enrichment." Restatement (Third) of Restitution and Unjust Enrichment § 13 (2011) (emphasis added). The Restatement is clear that Provident must prove that the transfer of benefits to Messing was induced by fraud to be entitled to an equitable lien for restitution.

---

[6]Although Provident now argues inducement is not a necessary element, it argued before the district court that "a person who has paid money is entitled to restitution if they were *induced* by the fraud." (Provident's Br. in Opposition to Pl.'s Mot. for Summ. J., R. 53, PageID #3165 (emphasis added).)

Provident relies on one out-of-circuit case, *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497 (5th Cir. 2013), to argue reliance is not required. In that case, the Fifth Circuit held that reliance was not an element of fraudulent misrepresentation under federal common law; and therefore, the insurance company could seek reimbursement for wrongfully paid LTD benefits. *Id.* at 516 ("[T]his court has not listed reliance as an element of fraudulent misrepresentation under federal common law."); *see also Massachusetts Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1455–56 (6th Cir. 1997). We agree that inducement is not an element of fraudulent misrepresentation, at least in the Fifth Circuit. However, the distinct question before us is whether a party must demonstrate inducement to be entitled to the equitable remedy of restitution. The Restatement tells us inducement is required.

Accepting that Provident must prove Messing's alleged misrepresentations induced the overpayment of benefits, the question becomes whether Provident has proffered enough evidence of inducement to survive summary judgment. The district court held Provident failed to meet its burden.

To prove inducement, Provident exclusively relies on the deposition testimony of Jennifer Crowley, the Senior Disability Specialist who commenced the review of Messing's claim in 2018. Crowley testified that if Provident "were notified that [Messing] had been working in any capacity [it] would have updated medical, completed an updated review at that time, contacted him to find out what the nature of his appearances were." (Crowley Dep., R. 53-6, PageID #3334.) Crowley stated that Messing's work as a lawyer would be relevant to its evaluation "[b]ecause it's showing that he can perform those duties"; but she acknowledged that performing an updated review of Messing's claim does not necessarily result in the termination of benefits. (Crowley Dep., R. 53-6, PageID ## 3336, 3338.)

As the non-movant, we must draw all reasonable inferences in favor of Provident. *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019). But Provident has not offered enough evidence to permit us to infer that it would have ceased Messing's benefits payments. At best, we can infer that Provident would have reviewed Messing's claim. But by Crowley's own admission, a review of Messing's claim does not necessarily mean it would have terminated his benefits earlier. Worse still, the 2004 newspaper article that suggested Messing had attempted to

represent two individuals was in Messing's file, but Provident did nothing to investigate or terminate his benefits. There is simply no evidence that Messing's allegedly fraudulent statements induced Provident to continue payments longer than it otherwise would have. Accordingly, the district court did not err in granting summary judgment on Provident's counterclaim seeking an equitable lien for restitution.

### D.  Equitable Lien by Agreement

Besides seeking an equitable lien for restitution, Provident also seeks an equitable lien by agreement. Provident argued that the Individual Disability Status Updates that Messing signed from 2010 through 2017 included a condition that Messing would repay any overpayments. In Provident's opinion, these promises constitute a sufficient agreement to give rise to an equitable lien by agreement. The district court disagreed and granted summary judgment for Messing on this counterclaim because the Individual Disability Status Updates were not part of the original insurance contract to which Messing agreed in 1985.

An equitable lien by agreement is "a type of equitable lien created by an agreement to convey a particular fund to another party." *Montanile*, 577 U.S. at 143; *Cent. States, Se. & Sw. Areas Health and Welfare Fund v. Health Special Risk, Inc.*, 756 F.3d 356, 365 (5th Cir. 2014) ("ERISA-plan provisions do not create constructive trusts and equitable liens by the mere fact of their existence; the liens and trusts are created by the agreement between the parties to deliver assets."). "[T]he strict tracing rules for equitable restitution [are] of no consequence" for equitable liens by agreement. *Sereboff*, 547 U.S. at 365 (quotation marks omitted). Instead, the overpayment itself is a fund distinct from the insured's assets to which an equitable lien may attach. *Zirbel*, 980 F.3d at 524. The lien "arises from and serves to carry out a contract's provisions." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 98 (2013).

Provident continues to argue on appeal that the Individual Disability Status Updates that Messing signed decades after the Plan went into effect are sufficient to create an equitable lien by agreement. Messing responds that to give rise to an equitable lien by agreement, the promise must exist in the original plan document, not a subsequent agreement.

In *Sereboff*, the Supreme Court permitted an insurance company to recover benefits because the health insurance plan included an "Acts of Third Parties" provision that required the the Sereboffs to reimburse the insurer.  547 U.S. at 361.  The plan in that case created an obligation to repay the insurer the amount of benefits the Sereboffs received from other sources in excess of their policy limit.  In other words, *the plan* specifically identified a particular fund to which the fiduciary would be entitled.

In *Gilchrest v. UNUM Life Ins. Co. of Am.*, 255 F. App'x 38 (6th Cir. 2007), we performed a similar analysis.  In that case we considered whether the plan itself identified the particular funds that would be subject to a lien.  The plan at issue "provided that disability benefits were to be reduced by 'deductible sources of income,' including, specifically, the amount an employee receives or is entitled to receive in Social Security disability benefits."  *Id*. at 39.  We permitted UNUM to seek an equitable lien by agreement because "the Plan's overpayment provision asserts a right to recover from a specific fund distinct from Gilchrest's general assets."  *Id*. at 45.

Our sister circuits have focused their analysis on the terms of the ERISA plan at issue as well.  For example, in *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083 (9th Cir. 2012), that court held that to be entitled to an equitable lien by agreement, three requirements must be met:

> First, there must be a promise by the beneficiary to reimburse the fiduciary for benefits paid *under the plan* in the event of a recovery from a third party.  Second, the reimbursement agreement must specifically identify a particular fund, distinct from the beneficiary's general assets, from which the fiduciary will be reimbursed.  Third, the funds specifically identified by the fiduciary must be within the possession and control of the beneficiary.

*Id.* at 1092–93 (cleaned up) (emphasis added).  Although there is no indication that a separate agreement formed the basis for Bilyeu's promise to repay, the Ninth Circuit focused the first element on whether the plan identified the particular fund that would be subject to the lien.  *See also ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 521, 528 (5th Cir. 2013) (en banc) (holding equitable lien by agreement attached when the plan contained a reimbursement provision); *Admin. Comm. for Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v.*

*Horton*, 513 F.3d 1223, 1227 (11th Cir. 2008) (noting that a "suit sounds in equity only if the ERISA plan's language identifies both the fund . . . out of which reimbursement is due to the plan and the portion due the plan." (citation omitted)).**7**

Provident relies predominantly on one district court opinion that permitted a post-plan agreement to serve as the basis for an equitable lien by agreement. *See Bosin v. Liberty Life Assur. Co. of Bos.*, No. 1:06-CV-186, 2007 WL 1101187 (W.D. Mich. Apr. 11, 2007). Although there are some similarities between *Bosin* and Provident's present appeal, that lone district court opinion is less persuasive than the intervening Supreme Court and circuit court opinions. In light of our case law in conjunction with that of the Supreme Court and our sister circuits, an equitable lien by agreement for the reimbursement of overpaid benefits under § 502(a)(3)'s equitable relief clause requires that the ERISA-qualified plan contain a promise to repay overpaid benefits.

Turning to the facts of this case, Provident's counterclaim must fail. The Plan simply does not provide for the recoupment of overpaid benefits. The closest the Plan comes to requiring repayment of benefits is through the condition that "Benefits are payable while a period of Total Disability continues" and that the beneficiary "must present satisfactory proof of [his] loss." (LTD Policy, R. 1-1, PageID #17.) But reading these provisions in tandem, at most, imposes upon Messing a continuing obligation to prove his inability to work as a personal injury trial attorney. This is far short of requiring Messing to refund overpaid benefits.

In *Gilchrest*, we held that "[w]hat is required [for an equitable lien by agreement] is that the agreement specifically identify a particular fund—distinct from the defendant's general assets—and a particular share of that fund to which the plan was entitled." *Id*. at 45 (quoting *Sereboff*, 547 U.S. at 364). No provision of the Plan identifies a "particular fund" as the source of the alleged repayments. *Montanile*, 577 U.S. at 143. Accordingly, Provident cannot obtain an equitable lien by agreement.

---

**7**We recognize that the cases upon which we rely—*Sereboff*, *Gilchrest*, and the out-of-circuit cases—all dealt with disputes in which there were only ERISA-qualified plans, not separate agreements to repay. Although they may be distinguishable in some ways, we find that their analyses provide useful guidance for resolving this appeal.

Finally, we note that to allow Provident to obtain relief through either an equitable lien for restitution or an equitable lien by agreement would be illogical in light of our separate holding that Messing remains disabled. It would make little sense to determine now that Messing's statements in the Individual Disability Status Updates—that he could not return to work—were fraudulent. And practically, it would make little sense to require Provident to resume LTD benefits payments to Messing while simultaneously permitting Provident to attach a lien on Messing's benefits payments.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court insofar as it affirmed Provident's decision to terminate Messing's benefits and **AFFIRM** the grant of summary judgment on Provident's counterclaims.